***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission adopts with minor modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. At all times relevant to this claim, the parties were subject to and bound by the provisions of the Workers' Compensation Act.
2. An employer-employee relationship existed between plaintiff and defendant-employer at all times relevant herein.
3. Defendant-employer was insured by two separate workers' compensation carriers at times relevant to these claims, to wit: Wausau Insurance Company was the carrier on the risk for the 1 August 1995 date of injury; and Fireman's Fund Insurance Company was the carrier on the risk from 9 September 1995 through 31 December 1996.
4. Plaintiff's average weekly wage was $370.73 on 1 August 1995 and $387.20 on 19 July 1996.
5. Plaintiff's last day of work with defendant-employer was 16 December 1996.
6. Plaintiff received short-term disability benefits totaling $7,592.78 beginning 17 December 1996 and continuing until 26 June 1997 for a total of 26 weeks.
In addition, the parties stipulated into evidence the following:
1. Form 19 for the 1 August 1995 injury.
 2. A packet of orders filed by the Industrial Commission submitted 19 April 2002.
 3. A packet of medical records and reports, which were not submitted on a timely basis but which have been received into evidence since plaintiff indicated that defendants would not stipulate to them until after all of the medical depositions had been taken.
The Pre-Trial Agreement dated 8 January 2002, which was submitted by the parties is incorporated by reference.
 ***********
Based upon all of the competent evidence in the record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff, who was 56 years old at the time of the hearing before the Deputy Commissioner, did not complete high school. She began working for defendant-employer in 1989. The company was a distributor of fine crystal products and cookware. Plaintiff worked in maintenance initially but underwent surgery in July 1993 for a ruptured disc at C5-6 and sustained an injury to her neck at work in approximately February 1994 when she slipped on ice. As a result of the restrictions imposed for her neck problems, she was transferred to the position of utility handler, which was a less strenuous job.
2. In August 1995, plaintiff's job as utility handler involved packing crystal and cookware for shipment. On 1 August 1995, plaintiff and Patricia Freeman, her supervisor, were each carrying a box of crystal to an inspection area when plaintiff's feet became tangled in a plastic band used to secure boxes. She fell face forward to the floor in such a way that her chin struck the box she was carrying which had landed on the floor ahead of her. As a result of the impact, her head was thrust backwards and bits of glass from the shattered crystal peppered her face. Ms. Freeman was afraid to move plaintiff due to the nature of the fall, so she summoned help.
3. Defendant-employer sent plaintiff to Primecare where she reported pain in her neck, her right trapezius area and her right eye, which had been scratched by broken glass. She also reported a tingling sensation in her right hand. Plaintiff was given medication and advised to return to work on 4 August 1995. When she returned to the clinic on 4 August, plaintiff indicated that she was hurting all over, except that her eye was better. She was told to stay active and was not provided further follow-up care.
4. During the rest of that month, plaintiff continued working but was in noticeable discomfort and her neck was so stiff that she was unable to turn her head and instead had to turn her entire body. Consequently, Ms. Freeman would help her in the mornings by picking product for her which was heavy or which was stored high up on a shelf. She also assigned plaintiff to the lightest available work in which plaintiff was required only to gift-wrap individual pieces. Ms. Freeman advised plaintiff to see a doctor about these problems and told her supervisors that plaintiff was continuing to have difficulty associated with the injury. For an unknown reason, plaintiff did not obtain further medical treatment; however, her condition improved and she was able to continue working, albeit with some difficulty.
5. Plaintiff saw her family physician in December 1995, complaining of a prickly sensation in her right hand and forearm as well as low back pain. She apparently went to the emergency room in May 1996 for neck-related complaints because x-rays were ordered of her cervical spine. Dr. Frank W. Ferrell, Jr., a radiologist, reviewed the films and found spondylosis at C5-6 with interspace narrowing. He was of the impression that the fusion she had undergone in 1993 had never become solid. However, no notes were provided from the treating physician for this presentation, so plaintiff's complaints and her treating doctor's findings are unknown.
6. Throughout this time, plaintiff felt like she was getting slower and slower at performing her job duties. Her work performance was reviewed periodically as satisfactory by her supervisors, but there was a drop in her work performance rating between the April and July 1996 performance reviews.
7. On 18 July 1996, plaintiff was transferred to "gift express" where she not only gift-wrapped items and packed them into boxes, but she also had to stack the boxes onto pallets and then use a pallet jack to load the pallets onto trucks. After two days in this new position, plaintiff developed severe neck pain and headache as well as a "pins and needles" sensation in her arms and sometimes her legs. Consequently, she went to Dr. Charles E. Rawlings, the neurosurgeon who had operated on her neck in 1993. He examined her on 24 July 1996, took her out of work for 10 days and ordered an MRI. The MRI was performed on 25 July 1996 and reviewed by Dr. Ferrell, who noted spondylosis with a spur on the left side at C5-6. There was a small bulging disc at C4-5 but it was central and did not appear to be a clear herniation, so Dr. Ferrell did not believe that it was diagnostically significant and he did not report it.
8. Plaintiff returned to Dr. Rawlings on 16 August 1996, symptomatically improved, although she still had noticeable cervical muscle spasm. Dr. Rawlings ordered physical therapy at that time. On 9 September 1996, he released plaintiff to return to work despite her complaints of persistent neck pain and numbness in her hands. She returned to work in her former position in the adjustments department but experienced considerable pain, so she had to work slowly. She reported these problems to her family doctor, Dr. Samuel Newsome, who sent her to Dr. Carlo P. Yuson, a neurologist. Dr. Yuson examined plaintiff on 12 September 1996. He performed nerve tests to plaintiff's upper extremities which revealed abnormalities of the ulnar nerves at her elbows. Dr. Yuson diagnosed plaintiff with a mild muscle strain syndrome and advised her to do exercises.
9. Over the next few months, plaintiff became increasingly clumsy and would stumble and drop things. Her back and legs bothered her as well as her neck and arms, and she could no longer go for walks with her husband or participate in active hobbies as she had before. By December 1996, her condition progressed to the point that she did not feel able to walk from her work station to the break area and back within the time allotted for breaks, so she would find a place to sit down and rest near her work station. However, she sustained no further injuries during that period of time.
10. On 16 December 1996, plaintiff went to the restroom to wash her hands at the end of her work shift. When she reached for a paper towel, her legs buckled and she fell to the floor. She was not injured as a result of the fall, but she had considerable difficulty in getting up, so the experience upset her greatly. She called Dr. Newsome who ordered an MRI and advised her to see Dr. Yuson right away. Plaintiff presented to Dr. Yuson on 18 December 1996. Despite plaintiff's symptoms, Dr. Yuson was of the impression that she simply had muscle and joint pains. He advised her to return to him in two weeks. Plaintiff was very dissatisfied with his evaluation and contacted Dr. Newsome who then referred her to Dr. David D. Meyer, another neurologist.
10. An MRI was performed on 19 December 1996, which was reviewed by Dr. Thomas Wiggins, a radiologist. Dr. Wiggins found a significant herniated disc at C4-5, a small disc at C6-7 and moderate foraminal stenosis. Dr. Meyer thereafter examined plaintiff on 30 December 1996. He noted that she had an ataxic, spastic gait and hyperactive reflexes in both extremities. Since Dr. Meyer had not seen plaintiff before and did not have her medical history, he had her return on 16 January 1997, after he had an opportunity to obtain and review her medical reports. By the time of plaintiff's second office visit, she was reporting that she could not get out of the bathtub. Thinking that she might have multiple sclerosis, Dr. Meyer ordered an MRI of her head, which proved to be normal. Although his note indicated that he also ordered another MRI of her cervical spine, it was not performed in view of the recent test.
11. When plaintiff returned to Dr. Meyer on 29 January, she could no longer walk on her own and could not feed herself. Dr. Meyer admitted plaintiff to the hospital that day for a myelogram/CT scan and a neurosurgical evaluation. The tests revealed a near complete block at C4-5 due to a large herniated disc which was pressing on the spinal cord. Her condition was diagnosed as spastic quadriparesis, and on 31 January 1997, she was taken to the operating room where Dr. William O. Bell, a neurosurgeon, performed surgery from an anterior approach to decompress and fuse the C4-5 interspace. During the operation, he found a central disc herniation. After surgery plaintiff experienced slow, progressive return of function of her arms and legs. She was discharged from the hospital and transferred to the Whitaker Rehabilitation Center on 5 February 1997, for rehabilitative care since she was not functioning well enough to go home. Plaintiff's condition improved sufficiently with rehabilitation and she was discharged to her husband's care on 13 February 1997.
12. Dr. Bell followed plaintiff's progress after her discharge from Whitaker Rehabilitation. She was able to wean herself from a walker to a cane by the 10 April 1997 office visit, but her left arm was still not very functional and Dr. Bell was of the opinion that she continued to have significant spinal stenosis at C5-6 and C6-7. Therefore, he recommended surgery from a posterior approach to decompress those levels. On 23 April 1997, Dr. Bell performed the operation. As plaintiff recovered from that surgical procedure, her complaints began to focus on her low back and left leg. A lumbar MRI revealed some spinal stenosis, but Dr. Bell was not impressed with the findings as of 19 August 1997. Later that year, he prescribed a back brace for her.
13. Plaintiff was also followed Dr. James M. McLean at Whitaker Rehabilitation, who appeared to take primary responsibility for prescribing her medications, although Dr. Newsome also provided some symptomatic treatment for her chronic pain. Plaintiff also received psychological counseling for depression which was associated with her ongoing pain and disability. In July 1997, Dr. McLean indicated that plaintiff could return to work on a part-time basis at light duty. Plaintiff had enjoyed her job and had found a great deal of personal satisfaction in performing her work duties, so she reported to the human resources manager at Princess House hoping to return to work. However, she did not appear to be able to work and she had significant restrictions. Consequently, the human resources manager sent her home and told her that she would have to have full duty work-release in order to come back to work.
14. At some time after plaintiff's original surgery by Dr. Bell, he questioned her extensively about her past injuries and medical history. He had initially seen plaintiff on an urgent basis for surgery and had not had an opportunity at that time to obtain a complete history. It was during this discussion that plaintiff first told Dr. Bell about her injury in August 1995. Based upon her complete medical history, Dr. Bell concluded that the cervical disc rupture for which he had performed surgery was a proximate result of the 1 August 1995 fall. In his opinion, when plaintiff hyperextended her neck upon striking her chin on the box, she sustained an annular tear in the disc which subsequently allowed disc material to herniate into the spinal canal. He informed her of his opinion at that time. Although plaintiff had not herself associated her subsequent difficulties with the earlier fall, she then sought legal counsel based upon Dr. Bell's medical opinion.
15. On 22 July 1997, a Form 18 Notice of Accident to Employer was filed with the Industrial Commission on behalf of plaintiff regarding the 1 August 1995 injury. That claim was assigned I.C. No. 727706. Two other Forms 18 were also filed for her that day: one for an injury occurring the second week of October 1996, which was assigned I.C. No. 727700, and another for an injury occurring 16 December 1996, which was assigned I.C. No. 727703. Another file was created at the Industrial Commission based upon a Form 19 submitted by Princess House regarding the October 1996 alleged injury. Since it showed a different date of injury, it was assigned to another claim number, I.C. No. 823922. Plaintiff testified that she sustained no injury at work in October 1996 and that she did not know why those claims were filed by her former attorney. Furthermore, she testified that she did injure herself further when her legs buckled in the restroom at work on 16 December 1996. Nothing unusual occurred at that time except that her legs gave way due to her underlying condition.
16. Regarding plaintiff's injury which occurred two days after she was transferred to "gift express" on 18 July 1996, Fireman's Fund Insurance Company (Fireman's Fund), which was the carrier on the risk at that time, admitted liability for benefits under the Workers' Compensation Act pursuant to a Form 63 which was filed with the Industrial Commission and assigned I.C. No. 661838. Fireman's Fund paid compensation to plaintiff from 24 July through 8 September 1996 regarding that injury and then filed a Form 28B notifying the Commission and plaintiff that they were closing her claim. No further action was taken in that case until June 2000. Plaintiff, through her former attorney, originally filed a Form 33 request for hearing in I.C. No. 727706 which was placed on the hearing docket. Plaintiff's current counsel later moved that additional claims be consolidated for hearing with that claim and, by order filed 22 June 2000, all of plaintiff's claims were consolidated for hearing.
17. The sole claim which is the subject of the current appeal to the Full Commission is I.C. No. 727706. Plaintiff sustained an injury by accident arising out of and in the course of her employment on 1 August 1995. The fact that she fell, landing on a box, constituted an unusual occurrence which interrupted her regular work routine. Her employer was immediately aware of the injury and provided some medical treatment.
18. Wausau Insurance Company (Wausau), which was the carrier on the risk in August 1995, has contested Dr. Bell's opinions regarding the causation issue with testimony from Dr. Ferrell and Dr. Yuson. Dr. Yuson's testimony is found by the Full Commission to be unconvincing, particularly since he misdiagnosed plaintiff's condition. Although Dr. Ferrell was a credible witness, his argument against Dr. Bell's position centered on the fact that the bulging disc observed on the July 1996 MRI was central whereas the ruptured disc shown on diagnostic tests performed in December 1996 and January 1997 appeared to be located on the left side of the spinal cord so that there would have had to have been two different annular tears. Despite the December 1996 and January 1997 test findings, when Dr. Bell performed surgery and actually observed the disc, he found a central herniation. Consequently, Dr. Bell was in the best position to determine the cause of the injury. Accordingly, the Full Commission gives greater weight to the opinion of Dr. Bell than to the opinions of plaintiff's other treating physicians.
19. The herniated disc at C4-5 for which plaintiff was treated beginning in December 1996 was a proximate result of her 1 August 1995 injury by accident.
20. As a result of the 1 August 1995 injury by accident, plaintiff was unable to work in any capacity from 17 December 1996 through the date of hearing before the Deputy Commissioner on 9 January 2002, and she was not expected to ever be able to return to work. As of the date of hearing before the Deputy Commissioner, plaintiff still required a cane to walk and she suffered from some spasticity in her extremities due to the cervical injury in question. She also experienced weakness and numbness in her arms and hands.
21. Dr. Bell subsequently treated plaintiff for problems in her spine which were unrelated to the injuries giving rise to these claims. He operated on her lumbar spine at least twice for unrelated conditions. He also performed the April 1997 surgery to the lower levels of her cervical spine which appeared to be of questionable relationship to the August 1995 fall since the doctor indicated that the stenosis at those levels was due to a longstanding degenerative process. However, Dr. Bell stated that he performed this surgery as a result of her fall because he believed that it was necessary to alleviate all sources of pressure on her spinal cord in view of the spasticity which had resulted from the ruptured disc at C4-5 which did arise from the fall. Consequently, the April 1997 operation was a direct and natural result of the 1 August 1995 injury by accident.
22. Although plaintiff's unrelated low back problems have been a factor in her disability, her inability to work has been primarily due to the cervical spine condition at issue. The Full Commission finds that plaintiff would have been disabled due to her cervical spine problems even if she had not had the additional lumbar spine problems.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On 1 August 1995 plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. As a proximate result of the 1 August 1995 injury by accident, plaintiff developed the ruptured cervical disc at C4-5 for which she was treated beginning in December 1996. Click v. Pilot Freight Carriers,Inc., 300 N.C. 164, 265 S.E.2d 389 (1980).
3. Plaintiff is entitled to compensation for temporary total disability at the rate of $247.16 per week from 17 December 1996 through the date of this Opinion and Award and continuing thereafter until she returns to work or until further order of the Industrial Commission. Defendants are entitled to a credit for short-term disability benefits paid during this period if those benefits were totally employer-funded. N.C. Gen. Stat. §§ 97-29; 97-42.
4. Plaintiff is entitled to have defendants provide all medical compensation arising from this injury by accident, including both surgeries Dr. Bell performed to her cervical spine in 1997. N.C. Gen. Stat. §§ 97-2(19); 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants Princess House and Wausau shall pay compensation to plaintiff for temporary total disability at the rate of $247.16 per week beginning on 17 December 1996 and continuing thereafter until she returns to work or until further order of the Industrial Commission. This award is subject to a credit for short-term disability benefits if the benefits paid to plaintiff were totally employer-funded. That portion of this compensation which has accrued shall be paid in a lump sum. This award is also subject to the attorney's fee hereinafter approved.
2. Defendants Princess House and Wausau shall pay all medical expenses incurred by plaintiff as a result of this injury by accident.
3. An attorney's fee in the amount of 25% of the compensation awarded in Paragraph 1 above is approved for plaintiff's counsel. Defendants shall deduct the fee from the accrued compensation to pay plaintiff's counsel directly and shall thereafter pay counsel every fourth check.
4. An additional fee in the amount of $570.00 is approved for Dr. Ferrell. Defendants Princess House Wausau shall pay him this fee and shall reimburse Fireman's Fund for any expert witness fees previously split between the insurance companies.
5. Defendants Princess House and Wausau shall pay the costs.
This the ___ day of April, 2003.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_______________ RENEE C. RIGGSBEE COMMISSIONER
 S/____________ BUCK LATTIMORE CHAIRMAN